IN THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LESTER ALLGARY,

            Plaintiff,

Case No.: 3-20-CV-204-J-34JBT

vs.

**BILL LEEPER,** as SHERIFF,
NASSAU COUNTY, FLORIDA,
in his official capacity, and
**KYLE THOLL,** Former Nassau
County Deputy Sheriff,
in his individual capacity,

            Defendants.

_____/

## SECOND CORRECTED AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, **LESTER ALLGARY,** by and through the undersigned attorneys, sues Defendants, **BILL LEEPER,** as SHERIFF, NASSAU COUNTY, FLORIDA, in his official capacity, and **KYLE THOLL,** Former Nassau County Deputy Sheriff, in his individual capacity, and hereby alleges as follows. This amended complaint is filed upon the written consent of counsel for Defendant Bill Leeper, and upon Order and instructions from the Court. This Second correction corrects a defect in service date listed in the corrected version.

### INTRODUCTION

1.    This is an action for violation of Plaintiff's rights under the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unlawful arrest. Plaintiff seeks

damages, as well as attorney's fees and costs.

2.   This action is brought by Plaintiff, a citizen of the United States, who was the victim of a willful and purposeful false arrest without probable cause, justification or excuse and which was made for malicious purposes only.

### JURISDICTION AND VENUE

3.   This action arises under 42 U.S.C. §§ 1983 & 1988. Jurisdiction is founded on 28 U.S.C. §§ 1331 & 1343.

4.   All incidents material to this action occurred in Nassau County, Florida, and both Defendants reside in Nassau County.  Venue is therefore proper in the Jacksonville Division of the Middle District of Florida pursuant to 28 U.S.C. § 1319(b), and Local Rule 1.02(b)(4).

### PARTIES

5.   Plaintiff, Lester Allgary, is an adult citizen of the United States and is currently a resident of Yulee, Nassau County, Florida, and was a resident of Nassau County, Florida during all relevant times of this action.

6.   Defendant, Bill Leeper, (the "Sheriff") is and at all times relevant was the Sheriff of Nassau County, Florida, and is sued in his official capacity only.

7.   At all times relevant, the Nassau County Sheriff's Office ("NCSO") was a police department operated wholly by Nassau County, and Defendant Kyle Tholl, ("Tholl"), was a natural person

and a duly-appointed police officer and deputy employed by said Nassau County Sheriff's Office.  Tholl is sued in his individual capacity only.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

8.   On or about October 17, 2017, Plaintiff was operating his vehicle upon the public roadways in Nassau County when he was stopped for a traffic stop by Deputy Tholl.  Whether the initial basis for the traffic stop was constitutional or justified is not clear at this time, and Plaintiff alleges it was not.

9.   At the time of traveling that day upon the roadway Plaintiff had with him in his car a glass jar (with lid) that contained liquid bleach.  Plaintiff had put the bleach in his car to do cleaning at a motel room he had been staying at, and the bleach had been present in the car for several days.

10.  At the time of the traffic stop Plaintiff also, unbeknownst to him, had a firearm in the vehicle, but such firearm was concealed inside a console and not visible to any person not conducting a search of the car.

11.  Upon approaching Plaintiff during the traffic stop, Tholl noticed the glass jar of bleach that was in plain sight, and asked Plaintiff what is was.

12.  Plaintiff then advised Tholl that the jar contained only bleach.

13.  Tholl, however, was not convinced and advised Plaintiff that he believed the jar contained illegal drugs, and he insisted

upon conducting a field test of the contents of the jar to determine whether there were illegal drugs inside.

14.  Tholl then removed the jar from the vehicle, and proceeded behind Plaintiff's vehicle where, according to his representations to Plaintiff, he was going to field test the contents for the presence of drugs.

15.  A short time thereafter, Tholl returned to speak with Plaintiff and advised him that the field test on the jar contents revealed that the jar contained illegal methamphetamine. As such, Tholl placed Plaintiff under arrest for trafficking in controlled substances, a serious felony.

16.  During the search of Plaintiff's vehicle incident to his arrest Tholl discovered the gun that was concealed in the console.

17.  In reality, however, Tholl never field tested the contents of the jar, despite that he represented in his arrest and booking report ("report") that he did so, and that the testing showed positive for methamphetamine.

18.  While the gun at issue was concealed in a console, Tholl alleged and stated in his arresting and booking report that the gun was in plain sight and under the jar of bleach.

19.  Tholl did not have body camera audio of video of his stop and arrest of Plaintiff. Proper NCSO policy required him to use his body camera and police cruiser dash video camera for the stop and arrest.

20.   At the time of the stop and his arrest, Plaintiff had a passenger in the vehicle with him.  Despite such, Tholl did not list the name or presence of the passenger on his arrest report of Plaintiff, despite that such is required by NCSO policies and procedures.

21.   Plaintiff was ultimately charged with, inter alia, trafficking in the controlled substance of methamphetamine and possession of a firearm by a convicted felon (which Plaintiff is).

22.   Plaintiff was unable to make bail for his charges and as such was incarcerated for an extended period of time.

23.   Ultimately, however, all charges against Plaintiff were dropped because it was discovered that not only had Tholl falsified the facts and records of his arrest, but that he had in fact falsified the facts and records of many, many arrests, where he would allege that he arrested persons during traffic stops for improper possession or trafficking in controlled substances, one way or another, when in fact they were not illegally possessed of any drugs or substances.

24.   Specifically with regard to Plaintiff's case, subsequent testing of the substance in the jar revealed that it was merely bleach and did not contain any methamphetamine.  It was further concluded that there was an improper basis to search Plaintiff's car to find the gun in question, which was concluded was not, in fact, under the bleach but was rather not visible and

was contained inside the console, per the advice of another officer witness who was on scene, Deputy Moyers, who observed the gun inside the console not under the bleach.  As such the discovery of the gun was the fruit of the poison tree of the improper search incident to the improper arrest.

25.  Subsequent to Plaintiff's arrest, but before the charges against him were dropped and before all the massive wrongdoings by Tholl were known to Plaintiff and the public, Plaintiff wrote a letter to the judge assigned to his case, alleging that he was essentially "set up" by Tholl, and at and about the same time, attorneys with both the State Attorney's Office and the Public Defender's Office which were involved in Plaintiff's case, as well as other cases, began to have concerns about inconsistences, omissions, falsehoods, and otherwise concerning aspects of Tholl's many traffic stops of motorists that turned into arrests for possession or trafficking of controlled substances.

26.  These events above stated, and specifically a complaint filed against Tholl by a criminal defendant Michael Collins (who was arrested by Tholl upon a claim of him having illegal drugs) resulted in the NCSO conducting for the first time an investigation into Tholl and the validity of his many traffic stop arrests related to drugs or illegal controlled substances.

27.  Ultimately, this investigation, which took place in December 2017 and concluded for practical purposes in February

2018, found that on many, numerous, multiple occasions, Tholl had engaged in fake, fraudulent, and fictitious arrests of motorists for possession of or trafficking in drugs or illegal controlled substances, when such was not true, and these persons arrested had committed no crimes.  His arrests included, but we not limited to arresting persons for possession of pills, capsules, powders or other substances he claimed were narcotics or illicit drugs when they were routine medications; and the arrest of Plaintiff for the bleach under the pretense that it was drugs.

28.  The investigation into Tholl determined that while in each case Tholl claimed to have field tested the "drugs" he supposedly was making the arrest for, he did not in fact do so, and subsequent testing by the NCSO during the investigation showed that in all such cases the "drugs" claimed by Tholl were, in fact, wholly legal substances and not drugs or controlled substances of any kind.

29.  The investigation into Tholl further determined that in multiple, many cases, Tholl failed to property document the stops/arrests with video or audio recordings, and failed to note in his arrest reports the presence of many witnesses in the vehicles when the suspects were arrested, all in clear violation of NCSO policy.

30.  At all times relevant, Tholl had a disproportionate rate of arrests by motorists for possession or trafficking drugs or controlled or illicit substances, when compared to the rate of

arrest of other patrol or traffic enforcement officers, and when considered against what would be reasonably expected to be the rate of arrests for such crimes in Nassau County. By "disproportionate," it is meant that the number of arrests by Tholl which were related to matters involving the possession or trafficking of illegal drugs was sufficiently greater than other officers performing the same policing tasks as Tholl, that the rate and number of arrests by Tholl was not in a proportion to be expected or anticipated by another officer performing the same tasks as Tholl (thereby giving rise to a concern as to why only Tholl has so many such arrests, and if they are, in fact, proper and justified). Despite this fact, the NCSO never spoke with, interviewed, investigated, or even asked him to explain his "success" in making so many arrests - until it was doing its own criminal investigation of him in late 2017.

31.   Furthermore, at no time before this investigation did the NCSO review, supervise, validate, or verify any such arrests by Tholl to determine if, in fact, those arrests and the reports therefrom were consistent with both reason and reality.  For instance, not until the investigation - commenced after Plaintiff was in jail awaiting trial but protesting his innocence - did the NCSO take notice in any way of the fact that Tholl's reports suggested that Tholl seemed to arrest people often without passenger witnesses (since his reports reflected no passengers often), nor did the NCSO review his video or audio recordings of

the arrests (or take note when such were missing) to see if they reflected that he was, in fact, field testing for drugs and controlled or illicit substances, and that his reports were consistent with bot his video and audio, and expected reality.

32.  Furthermore, at no time before the investigation into Tholl did the NCSO interview, talk with, discuss or debrief any other officers who were on-scene with Tholl for his many arrests (including the arrest of Plaintiff) to see and verify that Tholl was acting in a manner that was consistent with NCSO policies and procedures and the constitutional rights of the citizens arrested, and the representations of his own arrest reports.

33.  Had the NCSO spoke with such other officers, it would have discovered the anomaly that no other officers witnessed Tholl actually secure a positive field test for drugs or controlled substances in these cases.  Furthermore, in the case of Plaintiff specifically, it would have further discovered that Tholl actually told another officer on scene at the time of the arrest that the substance possessed by Plaintiff was suspected as bleach - before he falsely pronounced it methamphetamine.

34.  Had the NCSO reviewed the many arrests of Tholl and his records, videos, audios and other information from same, it would have discovered that not only were the numbers of his arrests questionably disproportionate warranting further investigation, but that other evidence, such as his arresting videos, audios etc., either did not exist as would be expected, or if they did

exist that they established that at no time did Tholl conduct field testing of substances as he claimed, and that furthermore he did not even suggest or comment that he had done so in such recordings.

35.   The specific need to provide such oversight, supervision, verification, analysis and fact-checking of Tholl, including fact-checking his actual "evidence" of seized drugs and controlled or illicit substances by independently having a supervisor or other office independently test the seized items to see if they were, in fact drugs or illicit substances (or in Plaintiff's case, see if it was in fact bleach), was further and always apparent, or should have been apparent to NCSO, because Tholl had been suspected of being involved in the EXACT same type of alleged misconduct and constitutional violations at his prior employment with the Dallas Texas Police Department, as he was involved in respecting Plaintiff and his general actions at the NCSO.

36.   In 2014, Tholl was a police officer with the Dallas Police Department when he came under investigation for arresting a citizen for possession and sale of cocaine.  However, the only actual drugs seized by Tholl in that arrest were legal drugs. Tholl was under investigation for both turning off his body camera during the arrest, and for being untruthful during a police investigation of his conduct.  However, the investigation was ended when Tholl suddenly resigned from the Dallas Police

Department.

37.   While this history of Tholl was critical to showing he
had a propensity to falsely arrest citizens for possession or
sale of illegal drugs when, in fact, they were possessed of legal
substances - and that he had a history of lying about it and
taking actions to cover up his acts of depriving citizens of
their constitutional rights - when Tholl applied to be a Deputy
with the NCSO, the NCSO did not request information on his
employment history with the Dallas Police Department, and/or it
chose to ignore the severity of that history and hired him anyway
without any special conditions.

38.   When he applied for employment with the NCSO, Tholl
further was asked on his application whether he ever resigned
from any law enforcement position.  He replied "No."  Despite the
patent falsity of the statement, the NCSO never discovered the
truth of that lie, or if it did it ignored it, all at the expense
of the constitutional rights of the citizens present in Nassau
County, including Plaintiff.

39.   It is commonly understood in the law enforcement
community that an officer who resigns while under investigation
is likely guilty of the matters of wrongdoing under investigation
- or has concern of the discovery of the truth - and is resigning
so to protect his ability to secure future employment with
another agency.

40.   The NCSO, therefore, had it taken mere minutes to

request and review his file from Dallas, would have discovered not one but two huge red flags that suggested that Tholl was about to engage in the exact same type of constitutional violations that he ultimately did respecting Plaintiff and many others in Nassau County.

41.   Specifically, had the NCSO reviewed and paid attention that was due to his Dallas file, it would have known that Tholl had a propensity to violate the constitutional rights of citizens by accusing them knowingly and falsely of possession or sale of illegal drugs or illicit substances, when in fact they were not actually possessed of any such drugs or substances, and that such propensity was clearly established as being a valid as opposed to speculative concern, since rather than simply demonstrate that he was innocent by defending himself, Tholl resigned to end the Dallas police internal investigation.

42.   Yet, the NCSO did nothing to discover, notice, or address the citizens' constitutional rights violations by Tholl that were in waiting.

43.   Had it properly reviewed, understood and addressed the situation in Dallas, the NCSO should have either not hired Tholl at all, both for lying on his application and for him having a high probability of being inclined to violate the constitutional rights of citizens, or if it did hire him, it should have subjected Tholl to routine enhanced scrutiny of his arrests for possession or sale/trafficking of drugs or illegal substances.

Had it done either action, none of the constitutional rights violations suffered by Plaintiff or anyone else would have occurred.

44.  Tholl ultimately admitted to his wrongful actions with the NCSO in violation of the constitutional rights of Plaintiff as well as many others.  His employ as a NCSO deputy was terminated, and he was prosecuted criminally, which criminal prosecution was ended in a plea agreement acceptable to the State.

45.  As a result of Tholl's actions while a NCSO deputy, many cases against persons he arrested were dismissed since they truly in fact had committed no crime, and the State Attorney agreed to review almost 100 prior cases of arrests by Tholl to see if action by the state to vacate convictions or pleas or other action was warranted in the interest of justice.

46.  The violating by Tholl of Plaintiff's constitutional rights and the rights of so many others could have been totally avoided had the NCSO simply done proper screening of Tholl and his history at his Dallas Police Department employ, and had it provided proper supervision over Tholl due under the circumstances, and properly trained supervisory officers to recognize signs and concerns of potential constitutional violations, and supervised and disciplined Tholl early for his actions before many, many persons saw their rights violated.

**COUNT I - 42 U.S.C. § 1983 CLAIM AGAINST DEFENDANT THOLL**

47.  Plaintiff realleges paragraphs 1 through 45, *supra*.

48.  Defendant Tholl, by his actions alleged above, in arresting Plaintiff knowingly without justification and probable cause and based upon false and fabricate evidence, lies, manipulation and deception, effected an unreasonable seizure and arrest of Plaintiff, in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and same is actionable under 42 U.S.C. § 1983.

49.  As a result of Defendant Tholl's intentionally and maliciously falsely-procured arrest of Plaintiff, Plaintiff has suffered and continues to suffer psychological injuries consisting of mental pain and anguish, humiliation, shame, and public ridicule, as well as suffered inconvenience, discomfort, and financial expense.  Included herein are the damages related to him being incarcerated for a lengthy period of time before the charges were dismissed against him; his loss of his job, income, and revenue while so incarcerated; and the damage to his reputation, because in real life if you are arrested and in jail for a period of time people think less of you, even if you are innocent.

50.  Plaintiff has retained the undersigned attorneys and is obligated to pay them a reasonable fee, and is entitled to collect that fee from Defendant pursuant to in 42 U.S.C. § 1988 if he is the prevailing party.  A reasonable fee for the undersigned considering the nature of this case and his

experience is no less than $475 per hour.

WHEREFORE, Plaintiff demands judgment against Defendant Tholl for compensatory damages, punitive damages, court costs, attorneys fees, and all other relief the Court finds just and proper.

## COUNT II - 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT SHERIFF LEEPER

51.  Plaintiff realleges paragraphs 1 through 45, *supra*.

52.  Defendant Sheriff either lacked or utilized policies, customs and practices which lead to the constitutional violations outlined in this complaint, and caused Plaintiff's injuries, all in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and same is actionable under 42 U.S.C. § 1983.

53.  At all times relevant and with the failures above-stated, the NCSO had a policy or polices related to hiring and to the review of the work/arrests by deputies in Tholl's position, and therefore Tholl, which policies were objectively deliberately indifferent to the likelihood that a particular constitutional violation - in this case, motorists being falsely arrested for fictitious possession of illegal drugs or illicit substances - would occur.

54.  Specifically as to allegations that the NCSO failed to supervise and discipline Tholl, the NCSO failed inasmuch in two regards; first, it failed to supervise him in that it failed to

take timely, proper and sufficient notice that he was failing to activate his body or patrol car dash camera(s) or other audio or video recording devices at times it/they should have been and were required by NCSO policy to be activated and recording; and second, it failed to properly, timely, accurately, sufficiently and with care that was due review and examine the recordings he did make, when he made them, to ascertain if the recordings he did make showed that he was performing arrests in a manner that was proper and constitutional. It then finally failed to discipline Tholl upon a finding that he was not activating or using proper and required recording devices and, when he did, upon noticing, as the NCSO would have if it supervised him properly, that he was violating the constitutional rights of citizens.  Had any of such processes been done by the NCSO prior to the "traffic stop" of Plaintiff, the violation of Plaintiff's constitutional rights would not have occurred.

55.  Specifically as to allegations that the NCSO failed to properly train supervisors to recognize the signs and concerns of constitutional violations, the NCSO was aware of the need to train supervisors to ensure that officers followed a policy of activating recording devices during arrests, and just as importantly, was aware of the need to train supervisors to be aware of those specific concerns that arise when an officer - like Tholl - selectively chooses when not to record arrests or stops, because such selective usage can indicate that

constitutional violations are occurring to citizens that are intended to be hidden. The NCSO was at all times relevant aware that it lacked any policy or process to train supervisors in this regard, and that the lack of such a training program was inadequate to protect the rights of citizens whom recordings by officers are intended to protect, along with the officers themselves. As such, the actions of the NCSO were sufficiently deliberately indifferent to the rights of citizens that its deliberate indifference was its official policy. Had any of such processes been done by the NCSO prior to the "traffic stop" of Plaintiff, the violation of Plaintiff's constitutional rights would not have occurred.

56.   Specifically as to allegations that the NCSO failed to properly train supervisors to recognize the signs and concerns of constitutional violations, the NCSO was aware of the need to train supervisors to ensure that officers followed a policy of making constitutional arrests by reviewing those video and audio recordings they do make during stops and arrests. The NCSO was at all times relevant aware that it lacked any policy or process to train supervisors in this regard to perform such task and perform them effectively to discover violations, and that the lack of such a training program was inadequate to protect the rights of citizens whom recordings by officers are intended to protect, along with the officers themselves. As such, the actions of the NCSO were sufficiently deliberately indifferent to the rights of

citizens that its deliberate indifference was its official policy. Had any of such processes been done by the NCSO prior to the "traffic stop" of Plaintiff, the violation of Plaintiff's constitutional rights would not have occurred.

57.  Specifically with respect to the process and decisions employed by the NCSO in hiring Tholl, the NCSO was deliberately indifferent to the risk that hiring an officer previously fired - or de facto forced to resign - as a result of fabricating or falsifying evidence would be likely to result in the same general constitutional violation of the rights of citizens in and present within Nassau County to be free from police officers fabricating and falsifying evidence during arrests.  Had the NCSO properly vetted Tholl before hiring, it would not or should not have hired him, or if it did it would have or should have intensely supervised him to ensure no repeat concerns, and had the NCSO done any of such, the violation of Plaintiff's constitutional rights would not have occurred.

58.  The NCSO failed to adopt or employ any policy which would review the arrests of officers under facts and circumstances that were unusual, disproportional to other officers, or inconsistent with the reality of police arrests in the area, "disproportional" being as "disproportionate" is defined herein *supra*.

59.  There was an obvious need for the NCSO to train and supervise its supervisory staff to be on the lookout for, and to

investigate and verify, arrests by officers that under facts and circumstances were unusual, disproportional to other officers, or inconsistent with the reality of police arrests in the area, and it was deliberately indifferent in not doing so, thereby increasing the likelihood that the particular constitutional violation suffered by Plaintiff would occur.  And it did.

60.  Even if the need to train and supervise was not so obvious, there was a sufficient pattern of constitutional violations by Tholl that were given a "blind eye" by the NCSO, thereby placing the NCSO on constructive notice of the need to so train and supervise. Tholl violated the rights of many people. He only could accomplish that because the NCSO never bothered to notice his unusual number and circumstances of arrests, and never picked up one single case file to verify its completeness and veracity or see if it appeared suspicious in any regard.

61.  In failing to properly screen Tholl's application to be a deputy with the NCSO, the NCSO and its final policymakers were deliberately indifferent to the constitutional violations that would ensue by hiring someone, such as Tholl, who lied on his application, was under investigation in Dallas for the very same type of constitutional violations of citizens at issue today, and who resigned while under investigation, a harbinger of de facto guilt.

62.  Had the NCSO and its policymakers / decision-makers read Tholl's emplpyment file properly from the Dallas Police

Department, it would have been understood by the NCSO that the plainly obvious consequences of hiring Tholl was that he would engage in the exact type of constitutional violations that he did respecting Plaintiff and many others.

63.   Likewise, even if Tholl was hired - after reading his Dallas Police Department file or not - once Tholl was working as a NCSO deputy, the facts and circumstances of his arrests were sufficiently usual, disproportional to other officers, or inconsistent with the reality of police arrests in the area that the NCSO should have understood, but rather it ignored, the plainly obvious consequences and facts that Tholl was likely engaging in the constitutional violations of citizens in Nassau County to have such and so many arrests, yet the NCSO did nothing allowing such violations of Plaintiff and others to persist.

64.   As a result of Defendant Sheriff's improper policies, customs, and/or practices, failure to screen, and failure to supervise and train and discipline, Plaintiff has suffered and continues to suffer psychological injuries consisting of mental pain and anguish, humiliation, shame, and public ridicule, as well as suffered inconvenience, discomfort, and financial expense. Included herein are the damages related to him being incarcerated for a lengthy period of time before the charges were dismissed against him; his loss of his job, income, and revenue while so incarcerated; and the damage to his reputation, because in real life if you are arrested and in jail for a period of time

people think less of you, even if you are innocent.

65.  Plaintiff has retained the undersigned attorneys and is obligated to pay them a reasonable fee, and is entitled to collect that fee from Defendant pursuant to in 42 U.S.C. § 1988 if he is the prevailing party.  A reasonable fee for the undersigned considering the nature of this case and his experience is no less than $475 per hour.

**WHEREFORE,** Plaintiff demands judgment against Defendant Sheriff for compensatory damages, court costs, attorneys fees, and all other relief the Court finds just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all matters so triable.

**ALL FLORIDA JUSTICE, LLC**
Law Office of Don Pinaud

_____
**Donald E. Pinaud, Jr.**
Trial Counsel
Fla. Bar No.: 111694
4495-304 Roosevelt Blvd, #202
Jacksonville, Florida 32210
(904)552-5500
(904)398-1568 - Fax
AllFloridaJustice.com
Don@AllFloridaJustice.com
Attorneys for Plaintiff

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the

foregoing has been filed with the Clerk of Court's electronic

filing system on this 23 day of May, 2020, which system will send

copies electronically to all counsel of record.

**ALL FLORIDA JUSTICE, LLC**
Law Office of Don Pinaud

_____
**Donald E. Pinaud, Jr.**
Trial Counsel
Fla. Bar No.: 111694
4495-304 Roosevelt Blvd, #202
Jacksonville, Florida 32210
(904)552-5500
(904)398-1568 - Fax
AllFloridaJustice.com
Don@AllFloridaJustice.com
Attorneys for Plaintiff